

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

CRH/MAA/IC
F. #2018R001309

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 25, 2023

By ECF

The Honorable Pamela K. Chen
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. McMahon, et al.
               Criminal Docket No. 21-265 (S-1) (PKC)

Dear Judge Chen:

      The government writes in response to defendant Congying Zheng's opposition to the government's motions in limine, see ECF No. 219 (under seal), filed on May 16, 2023 (hereafter "Zheng Opp.").[1] Contrary to the defendant's claims, the government alleges a single conspiracy committed by the three trial defendants and several other co-conspirators. Consistent with long-established precedent, statements made by co-conspirators in this scheme prior to Zheng's involvement are admissible against Zheng. The defendant was generally aware of the scope of the conspiracy and assumed the risk of his co-conspirators' actions and statements in furtherance of the conspiracy.

I.    Background

      The government alleges that Michael McMahon, Zhu Yong, and Congying Zheng (the "Trial Defendants"), together with other charged and uncharged conspirators, participated in a conspiracy to engage in an international campaign to threaten, harass, surveil, and intimidate John Doe-1 and Jane Doe-1 (together, the "Victims"), as well as their daughter (Jane Doe-3), and engaged in this conduct at the direction of officials of the People's Republic of China (the "PRC"

---

[1] In its scheduling orders related to motions in limine, the Court did not provide for the filing of reply briefs. See Orders, dated June 13, 2022 and April 17, 2023. Accordingly, the government also moves for leave to file this reply brief. Although the government does not seek leave to file a response to Trial Defendant Michael McMahon's opposition to the government's motions in limine, the government does not concede any of the arguments contained therein.

or "China").[2] The goal of the conspiracy was to coerce the Victims to return to China to face Chinese criminal charges as part of the Chinese government's "Operation Fox Hunt" campaign. The conspiracy occurred in several phases, over the course of multiple years, and the conspirators were responsible for discrete parts of the scheme. In 2017, Trial Defendants McMahon and Zhu participated in a scheme to convey John Doe-1's elderly father from China to the United States to coerce John Doe-1 to travel to China, and to surveil John Doe-1 during this part of the scheme in order to locate the Victims' residence. In 2018, Trial Defendant Zheng and a co-conspirator traveled to that same residence and left threatening notes that directed John Doe-1 to return to China to plead guilty to Chinese criminal charges and, in return, his family would remain safe.

II.     Legal Standard

Whether the government has proven a single conspiracy or multiple conspiracies is a question of fact that is to be determined by the jury. See, e.g., United States v. Sureff, 15 F.3d 225, 229 (2d Cir. 1994) (quoting United States v. Alessi, 638 F.3d 466, 472 (2d Cir. 1980)). "To prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." Id. (cleaned up); see also United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1192 (2d Cir. 1989) (explaining that "[n]onetheless, the participants' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at 'cross purposes'"). There is no requirement that the conspirators know each other or about their specific actions. Sureff, 15 F.3d at 230 ("A single conspiracy may encompass members who neither know one another's identities . . . nor specifically know of one another's involvement") (internal citations omitted); United States v. Richards, 94 F. Supp. 2d 304 (E.D.N.Y. 2000) (same); see also United States v. Eppolito, 543 F.3d 25, 47-48 (2d Cir. 2008) (explaining that "the conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan" and that "it is not necessary that the conspiracy even know the identifies of all the other conspirators").

As discussed in the government's motion, co-conspirator statements made in furtherance of a conspiracy are not hearsay, and are admissible against a defendant that participated in the conspiracy. See Fed. R. Evid. 801(d)(2)(E). This includes statements made prior to the entry of a particular conspirator into the criminal scheme: "with the conspiracy . . . fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy." United States v. U.S. Gypsum Co., 333 U.S. 364, 393 (1948); see also United States v. Farhane, 634 F.3d 127, 161 n.35 (2d Cir. 2011) ("Where statements are made in the course of an existing conspiracy in which the defendant later joins, those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made . . .").

---

[2] The government respectfully refers the Court to its opening brief in support of its motions in limine for a more detailed summary of the criminal scheme. See Mem. of Law in Supp. of Mot. at 2-5 (ECF Nos. 195, 196) ("Mot.").

III.  Argument

Trial Defendant Zheng argues that certain statements should be precluded from admission against Zheng because (1) the statements are outside the scope of the conspiracy and (2) many of those same statements were made prior to Zheng joining the conspiracy. See Zheng Opp. at 3-5.[3]  Both arguments are without merit.

Zheng's first claim rests upon the argument that there are "two distinct conspiracies" and that Zheng "at most . . . agreed to join only a narrower conspiracy." Zheng Opp. at 1, 3.  He asserts "there is no indication that these were not wholly separate conspiracies," (Zheng Opp. at 3), but the government has proffered more than enough evidence to establish there was a single conspiracy that Zheng joined.  The evidence establishes that the defendants all worked towards a "common purpose," see Beech-Nut, 871 F.2d at 1191-92, specifically the coerced repatriation of the Victims through stalking and harassment.  The fact that Zheng worked in furtherance of this common purpose at a different time and in a different manner than some of the other conspirators does not convert this one conspiracy into multiple conspiracies.  See Eppolito, 543 F.3d at 48 (explaining that a "single conspiracy [is] not transformed into multiple conspiracies simply by lapse of time, change in membership, or a shifting emphasis in its locale of operations") (internal quotations and citations omitted) (collecting cases).

In 2017, McMahon and Zhu facilitated a scheme to coerce the Victims to return to China through the unexpected and forced visit of an elderly relative, while Zheng and another conspirator subsequently, in 2018, taped threatening notes on the Victims' door intended to accomplish the same purpose. Zheng claims that "the only common tie[]" is the victim's address, but ignores the fact that the address was discovered by the 2017 work of his two co-defendants at trial and the message Zheng delivered was substantially similar to the message delivered in 2017. The additional claim that he "did not have information that the activities he was engaging in was directed by the People's Republic of China" (Zheng Opp. at 2) is contradicted by the notes themselves that Zheng left, which command John Doe-1 to serve time in Chinese prison—a directive that a reasonable person could (and would) infer came from the Chinese government. The defendants may have operated in separate spheres and at different times, but conspiracies "mature by successive stages" where "not all of those joining in the earlier ones make known their participation to others late coming in." Blumenthal v. United States, 332 U.S. 539, 556-57 (1947). Even if, as Zheng claims, he had a separate agreement from the other Trial Defendants, "by [those] separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." Id. at 558.  In any event, these are the fact-specific issues that a jury is entitled and required to consider.  See Sureff, 15 F.3d at 229.  The government has proffered sufficient evidence to establish the existence of a single conspiracy, and should be permitted to introduce statements by co-conspirators made in furtherance of that conspiracy against Zheng.

---

[3] Because Trial Defendant Zheng's brief is not paginated, the government identifies the page based on the total number of pages in the document, excluding the cover page.

3

Zheng's second argument, that the Court should preclude co-conspirators' statements made before he joined the conspiracy in August 2018, also fails. Decades of precedent establishes that statements made by co-conspirators prior to another's admission into the conspiracy can be used against the later-admitted conspirator. See, e.g., Gypsum, 333 U.S. at 393. The reasoning is straightforward and logical: a conspirator "'assumes the risk for what has already happened' in the scheme." Farhane, 634 F.3d at 161 n.35 (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.34[4][a], at 801–84); see also United States v. Badalamenti, 794 F.2d 821, 828 (2d Cir. 1986) ("It is reasonable to expect that a new recruit can be thought to have joined with an implied adoption of what had gone on before to enhance the enterprise of which he is taking advantage, where, as here, there is sound reason to believe that he joined when he was generally aware of what his new partners had been doing and saying on behalf of the enterprise.") (internal citations and quotations omitted).[4] Here, Zheng coordinated with multiple people to deliver notes to a person who he knew—from the words of the notes themselves, among other reasons—was already wanted and sought after by others affiliated with the Chinese government. He also knew that he was hired by others; even Zheng's proffer to the Court admits that he was part of a chain of people involved in conveying the threatening messages to the Victims. Zheng was therefore, at a minimum, "generally aware" that other conspirators had taken actions and made statements about his part of the scheme before he became involved, and Zheng therefore accepted the risk that earlier statements made as part of the conspiracy could later be used against him.

Finally, to the extent the Court concludes there is any remaining dispute about the admissibility of these statements, the government respectfully proposes that the Court follow the procedure set forth in United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969), pursuant to which "statements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of [the prerequisites to establish the Rule's application]." United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing Geaney) (internal quotation marks omitted); see also United States v. Loera, No. 09 CR 466 (BMC), 2018 WL 2744701 (E.D.N.Y. June 7, 2018) ("When the existence of the underlying illicit conspiracy is disputed, as it is here, courts in the Second Circuit follow the Geaney protocol.").

---

[4] At least one court has suggested that the Gypsum standard articulated by Farhan is broader than the description of the standard articulated in Badalementi. See United States v. Freedman, No. 18-CR-217 (KMW), 2019 WL 5387866, at *1 (S.D.N.Y. Oct. 22, 2019) ("Some decisions articulate a more inclusive test, without reference to a later-joining conspirator's awareness of what his partners had been doing and saying on behalf of the conspiracy before he joined it."). To the extent such a difference is meaningful, for the sake of this argument, the government applies the arguably more restrictive standard in Badalamenti. However, the government respectfully submits that the standard articulated in Farhan, a more recent decision, is more faithful to the Supreme Court's decision in Gypsum, which did not include any "general awareness" language. See Gypsum, 333 U.S. at 392-93.

4

IV.  Conclusion

Accordingly, and for the additional reasons stated in the government's memorandum of law in support of its motions in limine, the government respectfully requests that the Court permit the government to introduce certain co-conspirator statements against Trial Defendant Congying Zheng.[5]

                              Respectfully submitted,

                              BREON PEACE
                              United States Attorney

By:   /s/
       Craig R. Heeren
       Meredith A. Arfa
       Irisa Chen
       Assistant U.S. Attorneys
       (718) 254-7000

       MATTHEW G. OLSEN
       Assistant Attorney General
       Department of Justice
       National Security Division

By:   /s/
       Christine Bonomo
       Trial Attorney

Enclosures

cc:  Clerk of the Court (by ECF and email)
     Counsel of Record (by email)

---

[5] Trial Defendant Zheng requests, in a footnote, that the Court "consider a severance of defendants." The Court should deny that request as untimely. Even if not untimely, the defendant fails to meet the heavy burden necessary to require severance. See, e.g., United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant must establish prejudice so great as to deny him a fair trial."); United States v. Page, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice.").