**RENEE M. WONG, ESQ.**
ATTORNEY AT LAW
**401 BROADWAY, SUITE 306**
**NEW YORK, NEW YORK 10013**
RENEE@WONGLAW.NET
**(917) 701-0792**
**FAX: (212) 966-0588**

January 8, 2025

Honorable Pamela K. Chen
United States District Court Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201
Filed Via ECF

RE:     *United States v. Zheng Congying*
        Docket No. 21-cr-265 (PKC)

Your Honor:

Please accept this sentencing memorandum submitted on behalf of Congying Zheng, who is presently scheduled to be sentenced before Your Honor on January 22, 2024. We are asking for Your Honor's leniency in determining a sentence which fairly reflects Mr. Zheng's culpable conduct in the subject offenses, his background and character, and the extreme collateral consequences to follow post-conviction.

Mr. Zheng is a 28-year-old Legal Permanent Resident of the United States, and a citizen of the People's Republic of China. He had a very difficult upbringing and immigrated to the United States for an opportunity for a better life. Mr. Zheng has no loyalties to China and no meaningful familial relationships outside of the United States. He reports being bullied as a child by other children whose parents were members of the Chinese Communist Party. Although he

was acquitted of the top charges at trial, including conspiracy to act as an agent of the PRC, he is forever labeled as the PRC's "hired muscle to intimidate."[1]

Mr. Zheng is far from hired muscle and was merely used as a pawn to purportedly serve the interests of the PRC. Although Mr. Zheng departed China with no intent to return, the Chinese Communist Party intervened in Mr. Zheng's life. Ultimately, his conviction in the United States will lead to his involuntary return to the PRC.

Following an approximately three-week trial, Mr. Zheng was found guilty of Counts Three and Four of the Superseding Indictment, Conspiracy to Engage in Interstate Stalking (18 U.S.C § 371) and Interstate Stalking (18 U.S.C. §§ 2261A(1)(B) and 2261(b)(5)). He was acquitted of Counts One and Two, Conspiracy to Act as an Agent of a Foreign Government Without Prior Notification to the Attorney General and Acting as an Agent of a Foreign Government Without Prior Notification to the Attorney General. (18 U.S.C. §951(a), 2 and 3551 *et seq.*).

The Probation Report calculates Zheng's Guidelines between a range of 27-33 months, and defense counsel does not object to Probation's Guideline calculation.[2] Ultimately Probation recommends a sentence of 24 months of incarceration, which is a sentencing that is more severe than necessary to meet the sentencing goals set forth in 3553(a).

Mr. Zheng made a mistake at the young age at of 22-years-old. He knew that it was a mistake at time and even tried to fix it before it was too late. Mr. Zheng regretted what he did immediately, but he had no idea that his actions were of national importance.  The consequences

---

[1] Safeguard Defenders, *Involuntary Returns China's Covert Operation to Force 'Fugitives' Overseas Back Home*, at 44 (2022).

[2] The Government objects to Probation's finding that Mr. Zheng is a Zero-Point Offender pursuant to U.S.S.G. § 4C1.1. Defense counsel agrees that Mr. Zheng is elligible for Zero-Point Offender status, as he did not issue any credible threats of violence, as discussed *infra*.

for his conduct thus far have been far beyond anything he could have contemplated at the time of the offense.  Since his arrest in November 2020, he has been under very strict supervision. Despite his firm pre-trial conditions, he has tried to create some normalcy in life by working full-time, participating in his Church, and being an important member of his family to his mother and sisters.

It is respectfully requested that the Court sentence Congying Zheng to a term of probation, which is a sentence that is sufficient but not greater than necessary.

### Nature of the Offense

The United States government has a legitimate interest in investigating and prosecuting individuals working on behalf of the Chinese Government seeking to involuntarily repatriate Chinese nationals on U.S. soil. Chinese officials should not be enforcing Chinese laws in the United States through illegal means. There are several fugitives in the indictment including Hu Ji, a policeman with the Wuhan Public Security Bureau and Tu Lan, a prosecutor with the Hanyang People's Procuratorate. Also at large is Zhu Feng, a/k/a Johnny Zhu, a former U.S. lawful permanent resident who is also charged with the crime of Conspiracy to Obstruct Justice.[3]

Despite the national importance of this investigation and prosecution, Mr. Zheng should not be punished for the crimes of his co-defendants, either presently scheduled to be sentenced or at-large. He was acquitted of the Counts regarding Acting as an Agent of the PRC. Throughout the trial, there was overwhelming evidence of the crimes committed by co-defendants in 2017.

---

[3] Count Six of the Superseding Indictment charges co-defendants Tu Lan and Zhu Feng with Conspiracy to Obstruct Justice, whereby it is alleged that "TU LAN and ZHU FENG, also known as "Johnny Zhu," together with others, did knowingly, intentionally and corruptly conspire to obstruct, influence and impede an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.." *ECF 77*.

Mr. Zheng's involvement in conspiracy is limited in scope and duration, specifically to the dates of September 4-5, 2018.

We respectfully ask the Court to consider Mr. Zheng's conduct in light of the information he possessed regarding the victims' state of mind at the time of his conduct. Ultimately, the jury found that Mr. Zheng's behavior was conduct that would cause, would attempt to cause and would reasonably be expected to cause the victims substantial emotional distress. John Doe #1 and Jane Doe #1 testified that there was substantial harassment and stalking conduct created by the PRC causing extreme emotional distress prior to September 4, 2018. The victims are reasonably alarmed by Mr. Zheng's conduct, as the PRC has demonstrated that it is willing to use coercive and unlawful tactics to achieve repatriation.

Mr. Zheng's state of mind during the commission of the offense is highly distinguishable from his co-defendants convicted of acting as agent of a foreign government. The trial did not demonstrate that Mr. Zheng was aware of John Doe #1's Red Notice, or that his own actions were part of a coordinated effort of the PRC.

On September 4, 2018, Mr. Zheng made a highly regrettable choice to do a favor for his former friend and boss Chaohong Chen. He never received any type of compensation or benefit for completing this task. Mr. Chen was in California and sought out Mr. Zheng and his co-defendant Kuang because they were located on the East Coast.

On September 4, 2018, Mr. Zheng drove and picked up Kuang in Brooklyn, New York. Kuang was instructed to tell a message to John Doe #1, and if he was not present to post notes on John Doe's door. Kuang brought three pre-written notes to post. Mr. Zheng brought a tape dispenser, as per Kuang's request. Mr. Zheng drove to New Jersey, using an address he obtained

from Chen. At first, he got lost but ultimately, Mr. Zheng and Kuang were able to locate the residence.

Both individuals knocked at the front door, and there was no answer. It appeared that no one was home. The duo walked around the back to the deck, and Mr. Zheng posted three notes. Then they left. During this time, Kuang was on a video call with Chen.

Very shortly thereafter, Kuang and Mr. Zheng returned to the front door of the residence at Chen's instruction. Chen said to take down two of the notes, as three notes on the door might be too conspicuous. They did as they were instructed by Chen and left the premises.

The following day, Mr. Zheng returned alone to John Doe #1's residence for the purpose of removing the note. This was his best attempt to remedy his actions, as he recognized leaving the note was foolish. Before returning the residence the second time, Mr. Zheng did not anticipate that anyone would have seen the note. Based upon his observations from the day before, it was not apparent that anyone was home. The residence looked like it had been vacant. There were packages at the front door, and undeliverable package slips from FedEx. To the best of Mr. Zheng's knowledge, no one was home on September 4th. He believed that if he could remove the note left from the previous day, that John Doe #1 would not have received it.

The video footage shows Mr. Zheng approaching the front door, as he did the day before. He went to go look to see if the note was still taped on the door. It was no longer present, and he left. At no point on this date does Mr. Zheng attempt to contact the victims by knocking or make any additional trips around the curtilage of the house.

The government argued at trial that he went back to check if the note had been moved indicating that the victims had been present at the residence. Perhaps the theory also could be that he would attempt to contact the victims a second time to achieve the goals of SKYNET.

Both of those theories are unavailing. He made no attempts to contact the victims, and did not even knock on the front door on day two.

As demonstrated in the trial, the only co-conspirators that Mr. Zheng communicated with were Kuang and Chen. Kuang testified that he did not know Mr. Zheng went back the following day. Chen also provided information to the government which is consistent that he was unaware that Mr. Zheng returned. Mr. Zheng did not inform any co-conspirator that he returned to the residence and that the note was removed. He attempted to thwart the conspiracy by removing the message.

Mr. Zheng never returned to John Doe #1's residence after September 5, 2018. He never attempted to make any contact with the victims in any manner. He was apprehended in November 2020, with no indication that he made any additional actions in furtherance of the conspiracy.

### Mr. Zheng is a Zero-Point Offender

The government objects to the application of a Zero-Point Offender adjustment pursuant to the USSG §§4C1.1(1)-(10), on the basis that the Mr. Zheng issued a credible threat of violence in connection with the offense. There is not a scintilla of evidence which demonstrates that Mr. Zheng is a violent person. There are no facts to substantiate that Mr. Zheng had the intent to injure the victims, or any other person.

The United States Sentencing Guidelines does not define the terms "credible threat of violence. For purposes of § 4C1.1, "'[o]ffense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." *Id.* § 1B1.1 cmt. n.1(I); § 4C1.1(b)(1). Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or

willfully caused by the defendant" as well as certain acts of others when done as part of "a jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1).

The Eastern District of New York has previously held that the 4C1.1(a)(3) inquiry is keyed on the defendant's own conduct and "turns on the actions of the defendant himself or herself, not the actions of others." *United States v. Celso*, 2024 U.S. Dist. LEXIS 91819, *4, 2024 WL 2319679 (EDNY 2024), *quoting United States v. Tyng Jing Yang*, 2024 U.S. Dist. LEXIS 22938, *14-15, 2024 WL 519962 (DDC February 2024). The Court noted that the Guideline provision defining Relevant Conduct, expressly directs consideration of the acts of the co-conspirators that are within the scope of a conspiracy when apply Guidelines in Chapters 2 and 3. As to Chapter Four, the Court should solely consider the conduct of the defendant. *Id.* (Denying a ruling that the defendant "used" force or threat of force by *conspiring* to employ such means but declined to award the Zero-Point Offender adjustment on other grounds).

The content of note left by Mr. Zheng did not convey a "credible" threat of violence. The Sixth Circuit has found that a credible threat of violence is found when "one who, with the intent to injure another, credibly communicates that intent, without acting on it—for example, when one credibly threatens to hit someone with a shovel, but has not yet swung the shovel." *United States v. Pineda-Durarte*, 933 F.3d 519, 522 (6th Cir. 2019).

Mr. Zheng fully acknowledges the content of the note itself is menacing and harassing. After sleeping on it, he decided himself that he should take it down. However, the note itself does not communicate a specific violent physical harm. The essence of the note is that if John Doe #1 goes back to China, that his family members would be "safe" or "okay." The note itself does not convey a specific threat of violence. It certainly does not convey that Mr. Zheng

7

himself, would commit any act of violence. He acknowledges tapping the note to the door, but ultimately it was Kuang who wrote the note at the instruction of Chen.

In assessing whether a threat is "credible" Courts look to contextual evidence, including the defendant's ability to complete the threat. He did not possess a weapon when he approached the New Jersey residence. There was no forced entry into the residence. There was no relationship between Mr. Zheng and the victims, where the victims may have knowledge that Mr. Zheng was a violent person.

The government argues that the conduct of the PRC government, forcing John Doe #1's family member to travel to New Jersey from China should be considered as contextual evidence. First as discussed, a Chapter 4 inquiry should be based upon the defendant's actions. The actions of the co-conspirators in this case are not relevant conduct for purposes of determining whether Mr. Zheng is Zero-Point Offender.

Additionally, the SKYNET conspiracy of involuntary returns of Chinese nationals should not be considered as Relevant Conduct pursuant to the April 30, 2024 Amendments to the Sentencing Guidelines, altering the "Relevant Conduct" offered in Section 1B1.3, by excluding "conduct for which the defendant was criminally charged and acquitted in federal court." United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, April 30, 2024 (effective November 1, 2024). Mr. Zheng is not an agent of the People's Republic of China and should not be sentenced as though he had the same goals and objectives as his co-defendants who were convicted of additional crimes.

Respectfully, the defense requests that the Court apply the Zero-Point Offender reduction as per Probation's recommendation.

### *Mr. Zheng should not have a more severe sentence than his Co-Conspirators*

Upon his arrest, Mr. Zheng gave a full statement to law enforcement without the benefit of counsel. Such statements were truthful to the best of his memory. He spoke very plainly to agents about the events he recalled from September 2018. It was not an event he had given much thought about because it happened two years prior to his encounter with law enforcement.

During his initial interview, Mr. Zheng identified Chaohong Chen as the person who gave him the instructions and gave law enforcement his contact information. He was able to identify Kuang as "Vincent," although he did not have his full legal name at the time. Zheng's post-arrest truthful statement reflects his minor involvement in this overwhelmingly complex conspiracy. It was truly shocking to Mr. Zheng that he was accused of acting as an agent of a foreign government.

The government decided not to charge Chen in this indictment. Chen contacted both defendants individually to orchestrate the stalking scheme. Chen gave Mr. Zheng the address of the New Jersey residence. Chen gave Kuang the instructions and content of the notes. Kuang called Chen after the they arrived at the New Jersey residence, pursuant to Chen's instructions. Although Chen could be categorized as organizer or manager of the stalking conspiracy, he will not be sentenced before Your Honor.

Kuang cooperated with the government and received a cooperation agreement. As demonstrated through Kuang's testimony, he lied to federal agents and prosecutors for over two years in about ten different proffer sessions. Kuang told law enforcement that he was in New Jersey on September 4, 2018, because Mr. Zheng had asked him to go to a spa. Kuang lied about the authorship of the notes, stating that Mr. Zheng wrote the notes prior to picking him up on

September 4, 2018. He further lied that Zheng had the offending notes in the glove compartment of his car, always claiming that Kuang never wrote the note.

Approximately a month before the trial, Kuang admitted that he wrote all three notes himself, prior to getting into the car with Mr. Zheng. Kuang's numerous lies and obstruction of justice interfered significantly with potential pretrial resolutions between the government and Mr. Zheng's counsel.

Arguably, Mr. Zheng and Kuang were equally culpable for the actions taken on September 4, 2018. Mr. Zheng at least tried, albeit unsuccessfully, to remedy his actions by removing the note the following day.

Upon Mr. Zheng's arrest, he provided truthful information to law enforcement regarding the information he possessed including the individuals involved to the best of his knowledge. Although Mr. Zheng pursued a trial on the charges in the indictment, he admitted responsibility for his actions on the date of his arrest.

Conversely, Kuang provided false information which negatively effected the government's case and hindered meaningful discussions with Mr. Zheng's defense counsel. He made every effort to lie to divert responsibility away from himself and onto Mr. Zheng. It took Kuang two years and ten different proffer sessions to finally convey truthful information to the government. Kuang's pattern of perjury and obstruction of justice does not warrant a 5K1.1 departure, and Mr. Zheng should not receive a sentence that is harsher than Kuang.

### The 3553(a) Factors Support a Below Guidelines Sentence

Mr. Zheng has written a letter for Your Honor's consideration in determining his sentence. This letter is fair reflection of the young man that I have had an opportunity to get to

10

know throughout the last four years. He was not born into fortunate circumstances and has struggled for the entirety of his life. In his letter you will see that he expresses authentic remorse and regret for his conduct. Despite his challenges, he has become an avid Church member, maintains full-time employment, and is trying to learn marketable skills.

Mr. Zheng was born in a small village in China, under conditions that could only be classified as extreme poverty. Mr. Zheng is the youngest of three children from his parents' marriage.  He was raised in a single parent household, after his father left the family at a young age. There was a social stigma in rural China for a woman raising children by herself. The family's only source of income and food was their farmland. The majority of his families' farmland was usurped by other local villagers, who deemed that a single woman was unfit to cultivate the land.

The farm was able to grow some vegetables, which were sold at the market. Frequently, there was insufficient food for the family. Mr. Zheng reports that his mother did not have enough money to purchase rice as a child, and the family would often make food from a powder. Eventually after many years, the farming conditions were improved when his mother was able to save enough money to purchase a cow to till the field. For most of his childhood, Mr. Zheng was malnourished.

When Mr. Zheng was 6 years-old, his mother received an opportunity of a lifetime. She received an offer for work in Macao. This job would finally provide enough money to support her family, and she would be able to give children a better quality of life. She was receiving no financial support from the father of her three children. The work would be demanding, and she would not be able to bring her children along with  her to Macao. It is not unusual in China, and in some instances customary, for grandparents to care for children while a parent works.

It was arranged his grandmother would care for Mr. Zheng and his sisters, while their mother was working in Macao. After a few short weeks, his grandmother contacted Mr. Zheng's mother, instructing her to come back and take care of the children. Mr. Zheng's father had already re-married at the time. His father told Mr. Zheng's grandmother to leave all three children at the orphanage if their mother did not return to China. His mother promptly returned to their life of poverty on the farm.

It is fair to say that Mr. Zheng's relationship with his father has been poor for most of his life. His father left his mother and sisters at an early age and had a bad reputation around the village. He has been sporadically involved in Mr. Zheng's life, and assisted him in coming to the U.S.  His father immigrated to the United States and eventually petitioned for him and his sisters to have legal status. His father and his new family also live in Brooklyn. They have very little contact, but Mr. Zheng reports that relationship is positive overall.

When Mr. Zheng and sister arrived in the United States ten years ago, he was allowed to live with his father's new family. Mr. Zheng was eighteen at the time of his arrival and was attending high school in Brooklyn.  But the invitation for him and his sister Carol to live in his father's house was short lived. It was made clear that Mr. Zheng and his sister were not welcome to live with his father. He dropped out and started working in a restaurant so that he could earn a living to support himself and sister.

High school in Brooklyn was difficult for Mr. Zheng. As a fresh arrival to the United States, the language barrier was challenging. Despite his young age and his academic success in China, his education needed to take a backseat to earning income. Mr. Zheng's sister Carol has submitted a letter to the Court, where she expresses her gratitude and remorse for the sacrifices her brother made for her. He dropped out of school to earn money and supported her financially

so she could continue her education. Carol was able to complete high school and continue her studies to become a registered dental hygienist. Although Mr. Zheng is her younger brother, she expresses that he has always tried to fill a paternal role that was ever absent from their lives.

Once his sister was able to naturalize, she petitioned for their mother to join them in the United States. Mr. Zheng was ecstatic for his mother to be able to come.  They live together and have a very close relationship. He admires and values the sacrifices she made to raise him and his sisters. Despite their humble upbringing, his mother always instilled a strong work ethic that her children seek to model in the United States. His mother did not submit a letter to the Court because she is unable to read or write in any language.

Although Mr. Zheng's mother never received an education, she made every effort in China for her three children to attend school. Mr. Zheng is an intelligent young man who was able to excel academically, but not socially, in China. His education in the United States is limited. He has picked up some skills with repairing mobile phones and operating e-commerce platforms. His English skills have improved considerably in the last few years.

Mr. Zheng is a diligent worker who has continuously maintained employment during the pendency of the case. He worked at a bubble tea shop, but he had to quit to attend the trial in May 2023. Since the end of the trial, he has been steadily working as a cashier in a 99-cent store in Brooklyn. His employer has submitted a letter in support of his sentencing. Mr. Zheng is a reliable and responsible employee.  He opens the store, and many days he closes the store. On the days he is not working, he is attending Church services or volunteering.

We ask the Court to consider that Mr. Zheng has been under the strict supervision of pretrial services since his arrest in November 2020, which is a form of punishment. From November 2020 through October 2021, Mr. Zheng's conditions of release required him to be

placed on home confinement. From October 2021 through March 2022, Mr. Zheng was still on home confinement but permitted to leave his house to work. Since March 2022, Mr. Zheng has been on a curfew. He has demonstrated his ability to follow all the conditions of his supervision for over four years. His ability to follow pretrial conditions is a strong indicator of the unlikelihood of him committing any future offenses.

Mr. Zheng has not been permitted to leave the Eastern District of New York since his arrest. The government has previously objected to defense counsel's request that Mr. Zheng be permitted to travel into Manhattan because the Chinese Consulate is in Manhattan. He was merely looking for more employment opportunities. Mr. Zheng most recently asked counsel if pretrial services would likely approve his employment with DoorDash (unlikely). Mr. Zheng is genuinely seeking to become a productive member of society and has been trying his best within the confines of his pretrial supervision for the last four years.

Being a defendant in this case has been an extraordinarily isolating experience. On the date of sentencing Mr. Zheng intends to appear alone, despite the willingness of his mother and two sisters to come to Court. His family members did not attend the trial, at his request. A few fellow Church members did attend the trial for a few days, to support him during breaks.

Mr. Zheng has been very open with his family about the nature of case since his arrest, and his family is supportive of him with full knowledge of his involvement. Mr. Zheng is ashamed, as his name and face have been plastered world-wide in press articles. Although he is absolutely deserving of familial support on the most difficult day of his life, he does not want to take any risk that his family would be subject to any press coverage. He is truly fearful that his family members would be photographed and potentially face scrutiny and harassment from the

press, the public, the Chinese Government, or the U.S. Government. Mr. Zheng would prefer to face sentencing alone rather subject his family to any harm for his action.

Finally, we ask the Court to consider the most serious collateral consequence of all, deportation. Mr. Zheng did not have a good life in China. At the age of six, all his adult family members, apart from his mother, were willing to abandon him. Currently, both of his parents and his sisters are all residing in United States.

Presumptively, Mr. Zheng will be deported to the PRC following his sentence. He will have to start his life over, again, this time without any resources and support from his immediately family. Mr. Zheng is very apprehensive about his future, and his involuntary return to the People's Republic of China.

On behalf of Mr. Zheng, I am respectfully requesting that Your Honor impose a non-incarceratory sentence. A sentence of probation would be sufficient, but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

Respectfully submitted,

S/

Renee M. Wong, Esq.

15

Honorable Judge Pamela K. Chen,

Hello! I am CONGYING ZHENG, and I am writing this letter to you today with my deepest regret. I know that I have made a serious mistake, and I understand that I need to be responsible. Standing in front of the law, I have no reason to defend myself, but through this letter I hope I can let you know some of my childhood experiences, and how these experiences have shaped my character, and ultimately led to my wrong decision in this matter.

I was born in a remote village in the mountain in China, where living conditions are very challenging. Our family is very poor, with only my mother, grandmother, two sisters and me. My father left us when I was young and started another a new family. Since then, there has been no man in the family to support the family. People in the village always look down on single-parent families like ours, believing that there is no "pillar" without a man, which often makes our family the target of bullying and exclusion.

Life is difficult, and my mother carried all the burden of raising the three of us alone. She gets up at four or five in the morning every day to cultivate the few acres of land we have. We grow vegetables to support and provide our daily needs. Later, the 5 acres of land that our family originally depended on for survival was also forcibly taken over by other villagers. They said that there was no man in our family, and we would not make good use of the land. In order to avoid conflict, my mother could only accept this discrimination wordlessly and gave up the land. I witnessed all this when I was a child, but I was defenseless to change it.

Due to the family's financial burden, my sisters and I had to ride bicycles every day and it took half an hour to get to school. Our life was simple due to shortage of money. There was no water heater at home, and we had to use firewood to cook. My mother ran between the fields and

the farmers' market every day. She left early and came back late, with almost no time to rest, just to provide us with the most basic living.

In school, because I was a child from a single-parent family, I was often mocked and bullied by my classmates. Sometimes they would humiliate me in public, and some students even threatened me for "protection fees". I was afraid of conflict and didn't know how to deal with it. I could only choose to swallow my anger and avoid problems. Teachers sometimes asked us to shake hands and make peace, but this never really solved the problem. I felt isolated and helpless, and slowly, I developed a timid and fearful character, became accustomed to tolerance, and even dared not refuse others.

This character accompanied me as I grew up and influenced every choice I made later. After coming to the United States, I met a friend who helped me to achieve my childhood dream of learning lion dance, and I felt that my life had improved for a while. However, he later joined a gang and asked me for help. At that time, I was very afraid of conflict. Although I knew it was wrong, I didn't dare to refuse his request because of my timid character formed from my childhood experience, fearing that it would cause more problems. In the end, under this fear and pressure, I made serious mistakes and embarked on the wrong path.

In the past few years, I have been reflecting on my mistakes and have been tortured by regret every day. I know that the mistakes I made have hurt others and myself. Fortunately, I found faith and joined the Church of Jesus Christ of Latter-day Saints. Under the guidance of the church, I understood the importance of faith, family, and responsibility, and began to understand why I was so weak in the past. I realized that if I had had this advice earlier, I might not have embarked on this wrong path.

In addition, I also worked hard to learn some new skills, such as how to repair mobile phones and run e-commerce. I hope with these skills, I can be self-reliant in the future and become a person who can contribute to society. I know that my behavior has brought irreversible consequences, but I still hope to have a chance to make up for my mistakes by improving myself.

Your Honor, I know that I must take responsibility for the mistakes I made, but I also sincerely ask that upon your sentencing, you can take into account the difficulties I have experienced since childhood and the influence of my character, as well as my deep reflection and repentance for these mistakes. I am now determined to change, and I hope to have a chance to start a new life and make up for my mistakes with my efforts and actions.

Respectfully,

Congying Zheng

尊敬的 Pamela K. Chen 法官阁下，

您好！我是CONGYING ZHENG，今天怀着深深的悔意向您写下这封信。我知道自己犯下了严重的错误，也明白我需要承担应有的责任。站在法律面前，我没有任何为自己辩解的理由，但我希望能通过这封信让您了解我成长中的一些经历，以及这些经历如何塑造了我的性格，最终导致我做出了今天的错误决定。

我出生在中国的一个偏远山村，那里的生活条件十分艰苦。我们家非常贫困，家里只有妈妈、奶奶、两个姐姐和我。我的父亲在我年幼时离开了我们，另组家庭，从那以后，家里再也没有男人撑起这个家。村子里的人总是看不起我们这样的单亲家庭，认为没有男人就没有"顶梁柱"，这让我们家时常成为被欺负和排挤的对象。

生活艰难，妈妈一个人肩负起抚养我们三个孩子的重担。她每天凌晨四五点就起床，到田地里耕种我们家仅有的几亩地，种蔬菜来维持我们的生计。后来，我们家原本赖以生存的5亩土地也被村里的人强占了，他们说我们家没有男人，不会好好利用这些地。妈妈为了避免冲突，只能默默接受了这一不公，放弃了那块地。我从小目睹这一切，却无力改变。

由于家庭的困境，我和我的姐姐们每天要骑着自行车，花半个小时才能到达学校。我们的生活简单而拮据，家里没有热水器，做饭要用柴火，妈妈每天都在田地和农贸市场之间奔波。她早出晚归，几乎没有休息的时间，只为了给我们提供最基本的生活保障。

在学校里，因为我是单亲家庭的孩子，我经常被同学嘲笑和欺负。有时候他们会当众羞辱我，甚至有学生勒索我收"保护费"。我害怕冲突，不知道该如何应对，只能选择忍气吞声，回避问题。老师有时会让我们握手言和，但这从未真正解决问题。我感到自己孤立无援，慢慢地，我养成了胆小怕事、害怕对抗的性格，变得习惯于忍让，甚至不敢拒绝他人。

这种性格伴随我成长，影响了我后来的每一个选择。来到美国后，我认识了一位朋友，他帮我实现了学习舞狮的童年梦想，我一度感到生活有所改善。然而，他后来加入了一个帮派，并向我寻求帮助。当时的我非常害怕冲突，尽管内心知道这不对，但因为从小形成的胆怯性格，我不敢拒绝他的请求，害怕会因此引发更多的问题。最终，我在这种恐惧和压力下，犯下了严重的错误，走上了错误的道路。

在过去的几年中，我一直在反思自己的错误，每天都被内心的悔恨所折磨。我深知自己所犯的错伤害了他人，也伤害了我自己。幸运的是，我找到了信仰，加入了耶稣基督后期圣徒教会。在教会的教导下，我明白了信仰、家庭和责任的重要性，开始理解为什么我过去会如此软弱。我意识到，如果我早些拥有这些引导，我可能不会走上这条错误的道路。

此外，我也努力学习了一些新技能，学会了如何维修手机和经营电商。我希望通过这些技能，未来能够自食其力，成为一个对社会有贡献的人。我知道自己的行为已经带来了无法挽回的后果，但我仍希望能有机会通过改过自新，为我的错误赎罪。

法官阁下，我深知自己必须为犯下的错误承担责任，但我也真诚请求您在判决时，能够考虑到我从小生活中的困境和性格的影响，以及我如今对这些错误的深刻反思与悔改。我现在决心改变，希望能够有机会重新做人，用我的努力和行动弥补过错。

恭敬地，

CONGYING ZHENG

Dear Judge Chen,

Hello! I am Congying Zheng's older sister, and my name is Carol Zheng. Carol is the name I changed after naturalization. My previous name was Huimin. The main reason I wrote this letter is to let you know what kind of person my brother is. We came from a rural family in China. Our parents have had a bad relationship since we were young and divorced when we were very young. My father married another woman and formed a new family. Our mother took care of us since we were young, and our father rarely participated in our lives since we were young. Although we lacked fatherly love, our mother's love was enough to make us feel happy and warm. My mother is a very simple and kind person. She taught us a lot of principles of life since we were young. She always told us to be kind people, and we always followed her advice.

My brother has always been a very honest and kind person. As long as it does not involve breaking the law, he will be happy to lend a hand and provide assistance. In the past, whenever the school was hosting an event, my younger brother was always very active in providing help, and he always helped to do the dirtiest and most tiring work without regrets. Teachers and classmates all liked and admired him. At home, my brother is the only man in our family. Naturally, my brother has taken on the responsibilities of taking care of the family since he was a child. My brother has always been helpful with the heavy work at home. My younger brother is more like a big brother in my heart because he has always taken good care of us.

Ten years ago, we were lucky enough to immigrate to the United States with our father and started a new life. In order to adapt the new life here, we decided to go to adult high school to learn English. In the end, I graduated, but my younger brother did not. Because my father and stepmother refused to take care of us and give us a place to live. In desperation, in order to let me concentrate on my studies, my younger brother chose to work in a restaurant to earn money to support our basic needs in life, and he once again became the backbone of our life. Fortunately, I went to college later, and after our hard work, I finally became a registered dental hygienist. In this matter, I am very grateful to my brother, but at the same time I feel guilty. Because if he had not chosen to drop out of school and work to earn money to support my studies, his life would be much better. If there is a chance, I want to support and take care of my brother, just like he took care of me and supported me, so that he can go back to school and concentrate on his studies.

My brother used to be an optimistic and cheerful person, but because of this lawsuit, he became silent and taciturn and rarely interacted with friends. He was afraid to interact with friends because he didn't know which friends he could trust, and he was afraid of being framed and used by his friends again. For this, our family felt very sad and didn't know how to help him. Your Honor, my brother is really a very kind person, and I believe that the law is fair and humane. I beg your Honor to reconsider and sentence him to probation. I am infinitely grateful!

Carol Zheng

亲爱的Chen法官大人，

你好！我是Congying Zheng的姐姐，我叫Carol Zheng。Carol是我入籍之后改的名字，我以前的名字叫Huimin。我写这封信的主要原因是想让你知道我的弟弟是一个怎样的人。我们来自中国一个农村家庭，自小父母关系不好，在我们很小的时候已经离婚了。父亲娶了另一个女人，组织了一个新的家庭。我们从小是妈妈照顾大的，父亲甚少照顾和参与我们的成长。虽然缺乏父爱，但妈妈的爱也足以令我们感到幸福温暖。妈妈是一个很淳朴善良的人，她从小就教育我们很多做人的道理，她一直告诉我们要做一个善良的人，我们也一直遵从她的教导。

弟弟一直都是一个很正直善良的人，只要不是违法犯罪的事，他都会很乐于伸出援手提供帮助。以前在学校，每当学校要举办活动的时候，弟弟总是很积极地提供帮助，而且总是无怨无悔地帮忙做着最脏最累的活，老师和同学都很喜欢他和欣赏他。在家里，弟弟是我们家里的唯一一个男人。很自然地，弟弟从小就担起了照顾家里的责任。家里粗重的活也是弟弟一直帮忙做。弟弟在我的心中更像是一个哥哥，因为他一直都很照顾我们。

十年前，我们很幸运地跟着父亲移民了来美国，开始了一段新的生活。为了适应这边的生活，我们决定去读成人高中学习英语。最终我毕业了，而弟弟没有。因为父亲和后母拒绝照顾我们的生活和给我们居住的地方。无奈之下，弟弟他为了让我可以专心读书，他选择了去餐厅打工赚钱来支撑我们的基本生活，他又再一次成为了我们生活的顶梁柱。很幸运，我之后去读了大学，经过一番努力，我终于成为了一个注册洗牙师。在这件事上，我很感激我弟弟，但同时也很内疚。因为如果他当初没有选择退学打工赚钱来支持我读书，他的人生会更好。如果有机会，我想像弟弟当初照顾我和支持我一样，支持和照顾弟弟，让他可以重新去校园专心读书。

弟弟原本是一个乐观开朗的人，但是因为这场官司，他变得沉默寡言，极少和朋友接触，也害怕和朋友接触。因为他不知道哪个朋友值得信任，也害怕再次给朋友陷害利用。为此我们一家人觉得很痛心，也不知道可以怎样帮助他。法官大人，我弟弟真的是一个很善良的人，我相信法律是公平也是有人情味。我恳请法官大人能再三思，判我弟弟判处缓刑。我在此无限感激！

                                        Carol

**Subject: Letter of Support for Mr. Zheng Cong Ying**

Edmond Cheung
2164 E 28th Street
Brooklyn, NY 11224

October 20, 2024

Honorable Pamela K. Chen
U.S. District Court Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

To Whom It May Concern,

I hope this letter finds you well.  My name is Edmond Cheung, and I have had the privilege of knowing Mr. Zheng Cong Ying through our church meetings. I am a local leader at the church that Ying is attending. Ying first attended our chapel in October 2023, and at that time, it was clear he was going through a difficult period. He appeared worried and burdened, but over time, I have seen a remarkable change in him.

Ying expressed to me that the church atmosphere brings him peace and comfort, and he has consistently attended our Sunday services ever since. He has also shown a deep commitment to learning the gospel by attending classes led by our missionaries, demonstrating a sincere desire to grow spiritually.

In addition to attending church, Ying has generously volunteered his time to help with various tasks around the chapel. Every Sunday, he assists with cleaning up the building, including the restrooms, after-service and other activities. Today, he even leads a group of young church members in these responsibilities, ensuring that the tasks are completed efficiently. Ying has gone beyond his assigned duties, showing a willingness to help in any way he can. His growth has also been evident in his interactions with others.  He is now more open, shares his experiences, and is eager to contribute to the spiritual life of the church community.

Over the time I've known Ying, I have witnessed his personal development and maturity. He is respectful, considerate, and hardworking. His dedication to his church responsibilities reflects his strong sense of duty and his commitment to making our church a welcoming environment for everyone. I truly believe that Ying has learned valuable lessons from his past and will continue on a positive path toward becoming a contributing member of society.

Thank you for your time and thoughtful consideration of my letter. If you have any further questions or require additional information, please feel free to contact me.

Sincerely,

Edmond Cheung
646-346-0263 | Ed.K.Cheung@outlook.com

Your Honor,

I am writing this letter to express my support for my employee, Mr. Congying Zheng, and to respectfully ask that you consider his character and the positive impact he has had on our community when reviewing his case.

Mr. Zheng has been working at my 99 Cent Discount Store for over a year. During this time, he has consistently proven himself to be hardworking, friendly, and extremely responsible, qualities that have earned him the trust and appreciation of both our customers and myself. Mr. Zheng is always the first to arrive at the store, diligently carrying out his duties and ensuring that every customer feels respected and welcomed. Many regular customers have expressed their gratitude for his friendly service and sincere attitude, often bringing him small gifts or homemade food as tokens of their appreciation. He is especially kind to children, often offering them chocolates to make them feel warm and happy.

Our store is located in a residential area, and many of our customers are elderly or families who rely heavily on our services. Mr. Zheng frequently goes out of his way to help customers in need, whether it's holding the door or offering extra assistance when necessary. On one occasion, an elderly customer fainted from low blood sugar, and Mr. Zheng immediately instructed a colleague to call 911, then helped the customer sit down and offered him a drink to regain his strength until paramedics arrived. When I asked him how he knew to do this, he told me he had noticed the customer's health condition through their conversations, despite his limited English skills. This incident touched me deeply and demonstrated his attentiveness and care.

Mr. Zheng's reliable service, polite demeanor, and genuine concern for our customers make him an indispensable member of our small store. He has brought a positive influence to our store and community, and losing him would be a significant loss for both us and our many customers.

For these reasons, I sincerely request that you show leniency when considering Mr. Zheng's case. He is a good person who contributes positively to the community every day, and I believe he deserves a chance to continue serving our store and the community. If you need any further information, please feel free to contact me.

Thank you for taking the time to read this letter.

Respectfully,
Joseph Liu
Owner, 99 Cent Discount Store
Phone: 646-525-9273
Email: jionghualiu@gmail.com